UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AMERICAN TELECOM CO., L.L.C., ET AL.,

    Plaintiffs,

v.

THE REPUBLIC OF LEBANON,

    Defendant.
_____/

Case No. 04-72596

Honorable Nancy G. Edmunds

**OPINION AND ORDER GRANTING DEFENDANT'S MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(1) [26]**

This matter comes before the Court on Defendant's motion to dismiss, brought pursuant to Fed. R. Civ. P. 12(b)(1), for lack of subject matter jurisdiction, arguing that Defendant Republic of Lebanon is entitled to immunity from this lawsuit under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1604. The issue presented in Defendant's motion is whether the FSIA's commercial activity exception, 28 U.S.C. § 1605(a)(2), applies here. Because Plaintiffs have not persuaded the Court that Defendant's allegedly improper conduct has a direct effect in the United States, Defendant's motion is GRANTED.

**I.    Facts**

In July 2004, Plaintiffs filed a complaint alleging breach of contract, breach of an implied contract, promissory estoppel, fraudulent misrepresentation, and fraud in the inducement against Defendant Lebanon for its conduct in connection with Plaintiffs' bid

proposals for two commercial contracts to manage cellular phone networks in Lebanon. The complaint alleges the following.

From 1994 through 2002, two companies held contracts with Lebanon to manage the two Global System for Mobile networks in Lebanon (the "GSM Networks") for a fee of $7,500,000 per month. (Compl. at ¶¶ 5-6.) In 2002, Lebanon terminated the contracts and announced that it would soon be holding an Auction-Tender for the management contracts of the GSM Networks. (*Id.* at ¶¶ 7-8.)

In January 2003, Plaintiffs paid $25,000 in exchange for a good faith and fair opportunity to participate in Auction-Tender. (*Id.* at ¶¶ 9-14.) Despite the fact that Plaintiffs had satisfied all pre-qualification requirements, they were disqualified without explanation. (*Id.* at ¶¶ 7-21.) The Auction-Tender was eventually cancelled due to questionable conduct by the Lebanese official running it, and Lebanon announced a new tender ("New Public Tender") to be run by a different department of the Lebanese Government, the Ministry of Telecommunications. (*Id.* at ¶¶ 22-24.)

Plaintiffs were concerned about submitting a proposal for the New Public Tender inasmuch as many less-qualified non-American companies had been pre-qualified in the Auction-Tender while Plaintiffs had been disqualified. (*Id.* at ¶ 25.) Plaintiffs opted to submit a proposal only after the Minister of Telecommunications and other Lebanese officials convinced Plaintiffs that Lebanon wanted American participation and that the New Tender would be handled in an appropriate manner, with all being treated in a fair manner and in good faith. (*Id.* at ¶¶ 25-30.) Accordingly, with these assurances from the Lebanese Government, Plaintiffs paid Lebanon a fee of $5,000 in exchange for a good faith and fair opportunity to participate in the New Public Tender. (*Id.*)

Unbeknownst to Plaintiffs, however, Lebanon only wanted an American company to participate in the New Public Tender in order to lend legitimacy to the process and to drive down the bids of the European and Arab companies. In fact, Lebanon had no intention of ever allowing an American company to be awarded a GSM Newwork management contract. (*Id.* at ¶ 29.)

After months of preparation costing over $500,000, Plaintiffs submitted their bid for the four-year management contract of GSM Networks, following all the rules and requirements contained in the Tender Information and Procedures (the "TIP"). (Compl. at ¶¶ 31-34; Ex. Q, TIP.) These included a $2 million peformance bond (the "Tender Bond"), guaranteeing the payment of $2 million to Lebanon if certain conditions occurred. Plaintiffs obtained the Tender Bond from an American Bank, First International Exchange Group, Inc. ("First International"), an affiliate of Atlantic Bank, located in Bingham Farms, Michigan. (Compl. at ¶ 31; Ex. Q, TIP at ix; Ex. U, Tender Bond.)

To participate in the New Public Tender, Plaintiffs were also required to obtain a Letter of Comfort from a qualified Lebanese bank assuring the issuance of both a $10 million bond (the "Management Performance Bond") and a bank guarantee in the amount of $20 million (the "Monthly Collection Guarantee"). (Compl. at ¶ 31.C.1.) Although Plaintiffs worked with a qualified Lebanese bank to secure the Tender Bond and the Letter of Comfort assuring the issuance of the Management Performance and Monthly Collection Bonds, difficulties arose. After numerous complaints, Lebanese Minister Qordahi altered the requirements for the Tender Bond and the Letter of Comfort, allowing the applicants to secure bank guarantees from an American financial institution but refused to extend the March 29, 2004 deadline for applications. (Compl. at ¶ 36.) Plaintiffs obtained all the

3

required bonds from First International. (*Id.* at ¶ 37-39.) Because time was of the essence, Plaintiffs submitted emailed copies of several submission documents, including the Tender Bond, because the TIP did not bar such submission and a Lebanese Government employee had confirmed that emailed copies would be acceptable for submission. (*Id.* at ¶¶ 4-42; Ex. Q, TIP.)

Plaintiffs strategically made an initial bid of $6.16 million per month for the management of the GSM Networks, but were prepared to lower the bid to $3.99 million per month during the "open tender" portion of the bidding, which allowed those deemed admissible to participate an opportunity to adjust their bids after the initial bids were revealed. (Compl. at ¶ 43; Ex. Q, TIP.)

On March 29, 2004, the date of the New Public Tender, Lebanon informed Plaintiffs that they were disqualified from participating because the Tender Bond in Plaintiffs' submission was an email document instead of an original document. (Compl. at ¶ 44.) Lebanon then announced the pre-qualification of seven non-American companies. (*Id.* at ¶ 45.)

At the conclusion of the bidding, Detecon of Germany and Mobile Telecom Company of Kuwait were the low bidders and were awarded the management contracts for the GSM Networks. Detecon was awarded the four-year mangement contract for one network for $4.2 million per month ($201 million total). Mobile Telecom Company was awarded the other four-year management contract for $4.25 million per month ($204 million total). (Compl. at ¶ 46.)

Defendant Lebanon presents the Court with documents that reveal additional facts relevant to this Court's inquiry.

In connection with the New Public Tender, Plaintiffs were required to initially submit two documents: an Expression of Interest ("EOI") and a Non-Disclosure Undertaking ("NDU"). These documents required Plaintiffs to acknowledge that their application to become a participant in the New Public Tender for the Network contracts did not in any way bind Lebanon to accept their proposal or to allow their participation. Specifically, in the EOI, Plaintiffs acknowledged their understanding that the document was "not legally binding and does not obligate the Ministry in any manner towards our consortium in connection with the Tender." (Def.'s Ex. B, EOI.) Moreover, the NDU, which Plaintiffs were required to and did execute, similarly provided that:

> Neither the Confidential Information nor anything else in this letter constitutes an offer by or on behalf of the Ministry and the Ministry will be under no obligation to accept any offer or proposal which may be made by the Applicant or on the Applicant's behalf. Neither the Confidential Information nor anything else in this letter will form the basis of any contract, which will constituted solely by an final agreement(s) to be negotiated and entered into between the Applicant and the Ministry.

(Def.'s Ex. B, 2/25/04 NDU at ¶ 2(f).) The NDU further provided that the Applicant was responsible "for any costs incurred by it or on its behalf in connection with the Tender" and that the NDU was to be "governed by and construed in accordance with Lebanese law and that the parties hereby submit to the non-exclusive jurisdiction of the Commercial Court of Beirut" for any lawsuits regarding the subject matter of the NDU. (*Id.* at ¶¶ 5, 10.)

The TIP established the guidelines for all bid applicants. That document, in its Preface, clearly expressed that "The Republic of Lebanon reserves the right to reject the

5

offer to manage either of the Mobile Businesses through the Tender, and to discontinue the Tender at any time for any reason." (Def.'s Ex. C, TIP at ii.)

The successful bidders in the New Public Tender were awarded Management Agreements for the Lebanese wireless networks. The terms of that Agreement reveal the following obligations on the part of the successful bidder. It must form a "company" in Lebanon and that company must assume all existing and new employee contracts. (Def.'s Ex. D, Management Agreement at 5, ¶ 1.1, defining "company" as "a wholly owned subsidiary in Lebanon . . . or a Lebanese joint stock company (S.A.L.) to be incorporated in Lebanon by the Selected Participant and that shall assume the contracts of the Existing Personnel and all other employees".) It was further required to hire all existing Lebanese employees who wished to remain "for a minimum of four years on the same or better terms. . . , while preserving the Employees' vested rights and years of service." (*Id.* at 21-22, ¶ 12.1.) Moreover, all user service fees under the contract were to be paid in Lebanon and deposited into a Lebanese bank account. Then, all management fees would be withdrawn from that Lebanese bank account, with the remaining funds being transferred to the Lebanese Government. (*Id.* at 19, ¶ 8.2.) Disputes arising out of the Agreement must be settled through arbitration proceedings in Geneva, Switzerland. (*Id.* at 47, ¶ 40.2.)

This matter is presently before the Court on Defendant's motion to dismiss, arguing that this Court lacks subject matter jurisdiction of Plaintiffs' lawsuit because the FSIA affords Lebanon immunity from suit. Plaintiffs respond that Lebanon is not immune from suit because the FSIA's commercial activity exception applies.

**II.     Standard of Review - Rule 12(b)(1) Motions**

Rule 12(b)(1) motions to dismiss for lack of subject matter jurisdiction fall into two general categories: facial attacks and factual attacks. *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994). The parties do not dispute that Defendant's motion presents a factual attack; i.e., "not a challenge to the sufficiency of the pleading's allegations, but a challenge to the factual existence of subject matter jurisdiction." *Id.* Accordingly, "no presumptive truthfulness applies to the factual allegations, and the court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Id.* (Internal citation omitted.)

**III.    Analysis**

The Court begins its analysis by examining the FSIA and its commercial activity exception. Lebanon argues that it is entitled to immunity from this lawsuit under § 1604 of the FSIA, which provides that: "Subject to existing international agreements to which the United States is a party at the time of enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in Sections 1605 to 1607 of this chapter." 28 U.S.C. § 1604. Plaintiffs, on the other hand, argue that Lebanon does not have immunity because the commercial activity exception set forth in § 1605(a)(2) applies here. The FSIA's commercial activity exception, 28 U.S.C. § 1605(a)(2), provides that a foreign state is not immune from the Court's jurisdiction "in any case" in which:

> the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the

7

foreign state elsewhere and that act causes a direct effect in the United States. . . .

28 U.S.C. § 1605(a)(2).

The burden of proof on this issue is as follows:

The party claiming FSIA immunity bears the initial burden of proof establishing a prima facie case that it satisfies the FSIA's definition of a foreign state; once this prima facie case is established, the burden of production shifts to the non-movant to show that an exception applies. [citation omitted] Nevertheless, the party claiming FSIA immunity retains the ultimate burden of persuasion throughout.

*Keller v. Central Bank of Nigeria*, 277 F.3d 811, 815 (6th Cir. 2002). There is no dispute that Lebanon is a foreign state. Accordingly, it is Plaintiffs' burden to produce evidence showing that an exception applies.

Plaintiffs argue that the commercial activity exception applies because (1) Lebanon's actions are commercial in nature; i.e., it solicited bids for a commercial project just as any private commercial party would do, and (2) Lebanon's commercial activity had a direct effect in the United States; i.e., wrongfully depriving Plaintiffs of the lucrative contracts at issue here which would have been performed in part by employees in the United States. Lebanon does not contest the first element, but does dispute the second.

The first element is satisfied "when a foreign government acts, not as a regulator of a market, but in the manner of a private player within it. . . ." *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (1992). Here, the contracts at issue were for cellular phone services; the type of commercial activity done by private parties.

The second element -- "a direct effect in the United States" -- has been described by the Supreme Court as follows: "an effect is 'direct' if it follows 'as an immediate consequence of the defendant's . . . activity.'" *Republic of Argentina v. Weltover*, 504 U.S.

607, 618 (1992) (citation omitted). The Sixth Circuit has declined to adopt the "legally significant acts test" applied by the Tenth Circuit in *United World Trade, Inc. v. Mangyshlakneft Oil Prod. Ass'n*, 33 F.3d 1232, 1239 (10th Cir. 1994). *Keller*, 277 F.3d at 817. Rather, the Sixth Circuit agreed with those appellate courts reasoning that when the Supreme Court rejected the suggestion that § 1605(a)(2) contains any unexpressed requirement of "substantiality" or "foreseeability," "this holding was an admonishment to the courts not to add any unexpressed requirements to the language of the statute." *Keller*, 277 F.3d at 818 (discussing *Republic of Argentina v. Weltover*, 504 U.S. 607, 618 (1992)). In *Keller*, the Sixth Circuit found that the failure to transmit promised funds to a bank account in Cleveland "constituted a direct effect in the United States." *Keller*, 277 F.3d at 818.

Contrary to Lebanon's arguments here, the *Weltover* and *Keller* decisions do not limit application of the commercial activity exception to circumstances where there is a contract between the parties and an obligation to make payments in the United States. Rather, in determining whether the commercial activity exception applies, the Sixth Circuit follows *Weltover* and determines whether the conduct complained about has a direct effect in the United States by examining whether the claimed effect in the United States "follows 'as an immediate consequence of the defendant's . . . activity.'" *Id.* at 817 (quoting *Weltover*, 504 U.S. at 618). *See also Gould, Inc. V. Pechiney Ugine Kuhlmann*, 853 F.2d 445, 453 (6th Cir. 1988) (observing, as to the plaintiff's lawsuit complaining that defendants had unlawfully obtained and used its trade secrets, that "[i]t is difficult to imagine conduct which will have a more direct effect upon plaintiff, which is located and operates in the United States.").

As Plaintiffs correctly observe, the guiding principle to be discerned from the *Weltover* and *Keller* decisions is that a contractual promise to pay funds in the United States is sufficient to show that FSIA's commercial activity exception applies. These decisions do not, however, hold that such conditions are necessary for application of that exception. To the extent *Dominican Energy Limited, Inc. V. Dominican Republic*, 903 F. Supp. 1507 (M.D. Fla. 1995), holds otherwise, this Court declines to adopt the rationale of that non-binding precedent.

The Court now examines the conduct of the Lebanese Government that Plaintiffs complain about in this suit to determine what effects, if any, will follow in the United States as an immediate consequence of that challenged activity. The gist of Plaintiffs' complaint is that Lebanon made fraudulent misrepresentations in connection with the application to bid process, fraudulently induced it to take part in the New Public Tender application process, and breached agreements to be fair and to consider, in good faith, Plaintiffs' applications to participate in the Auction-Tender and the New Public Tender bidding process. In their brief, Plaintiffs do not discuss the direct effects in the United States of Lebanon's alleged fraudulent misrepresentations or its fraudulent inducement.[1] Rather, Plaintiffs focus on their breach of contract claims.

---

[1] As discussed at the hearing on this matter, the immediate consequence of this activity would be Plaintiffs' payment of money to Lebanon; i.e., $25,000 to apply for the opportunity to take part in the Auction-Tender and $5,000 to apply for the opportunity to take part in the New Public Tender, as well as the expenditure of approximately $500,000 in connection with the application for the New Public Tender. Plaintiffs, however, failed to provide the Court with any authority supporting application of FSIA's commercial activity exception under these circumstances.

Plaintiffs speculate that, if their applications had been considered fairly and in good faith, then they would have been chosen as a Selected Participant for one or both of the two contracts at issue and further speculate that they would have subsequently been chosen to enter into a Management Agreement with the Lebanese Government. This, in turn, would provide these American companies, as sole shareholders in the Lebanese subsidiary, with huge profits and the corresponding opportunity to hire American workers in addition to the retained Lebanese employees, to export American-made goods, and to pay taxes to the United States Government.

There are several problems with these arguments. First, the chain of events Plaintiffs describe are not the immediate consequence of Lebanon's challenged activity. The immediate consequence would be the denial of their application. Second, contrary to the documentation presented to the Court, Plaintiffs' argument implies terms of good faith and fair dealing that are not expressed in the application documents. In the EOI and NDU, Plaintiffs acknowledged their understanding that the Lebanese Ministry was not obligated to Plaintiffs in any manner and that the Ministry was under "no obligation to accept any offer or proposal . . . made by the Applicant or on the Applicant's behalf." (Def.'s Ex. B, NDU at 2, ¶ 2(f).) The Preface to the TIP further emphasized that "The Republic of Lebanon reserves the right to reject the offer to manage either of the Mobile Businesses . . . at any time for any reason." (Def.'s Ex. C, TIP at ii.)

Plaintiffs' final argument likewise fails. Plaintiffs speculate that, if they had been chosen as a Selected Participant in the New Public Tender bidding process and failed to perform as required in that bidding process, then the $2 million Tender Bond they obtained from an American bank would require payment from that American Bank to the Lebanese

Government. The chain of events Plaintiffs describe in this scenario are not the immediate consequence of any activity on the part of the Lebanese Government that Plaintiffs challenge in this suit. Rather, they speculate about a breach of the Tender Bond by Plaintiffs that would trigger action by Lebanon for payments obligated to be paid to Lebanon; actions that would have a direct effect in Lebanon, not the United States.

Because Plaintiffs have not shown that the FSIA's commercial activity applies here, Lebanon's motion to dismiss is GRANTED.

**IV.   Conclusion**

For the foregoing reasons, Defendant's motion to dismiss is GRANTED. Plaintiffs' complaint is dismissed.


s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  September 9, 2005

I hereby certify that a copy of the foregoing document was served upon counsel of record on September 9, 2005, by electronic and/or ordinary mail.

s/Carol A. Hemeyer
Case Manager

12